RECEIPT #
AMOUNT $ 150
SUMMONS ISSUED (1)
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK.
DATE 2/3/04

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

04    10238 DPW

| | |
|---|---|
| WING KAM YU, on Behalf of Himself and All Others Similarly Situated, | ) ) |
| Plaintiff, | ) **CLASS ACTION COMPLAINT** ) **FOR VIOLATIONS OF** ) **FEDERAL SECURITIES LAWS** |
| vs. | ) ) |
| NETWORK ENGINES INC., JOHN CURTIS and DOUGLAS G. BRYANT, | ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) ) |

MAGISTRATE JUDGE Collings

---

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Network Engines, Inc. ("Network Engines" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1.  This is a federal class action on behalf of purchasers of the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period"), who have incurred damages, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.  Network Engines develops, manufactures and distributes server appliances for network equipment providers who, in turn, deliver the finished data storage and security network applications to their clients.

3.     Plaintiff alleges herein that defendants' favorable Class Period representations regarding their business were materially false and misleading because they failed to disclose that the Company's agreement with its largest customer, EMC Corporation ("EMC"), accounting for over 47% of total 2003 revenues, was being renegotiated and that EMC was demanding terms that would materially and negatively impact Network Engines' profitability. Instead of disclosing the highly material fact that a key customer was pushing for concessions that would be harmful to the Company, and difficult to effectively resist given EMC's tremendous clout in the negotiations, defendants falsely represented that its strong growth in 2003 marked a "dramatic turnaround for Network Engines," and that such growth was sustainable and expected to continue in 2004. In fact, at the time such representations were publicly disseminated, defendants knew the Company's business was about to take a dramatic turn for the worst.

4.     On December 10, 2003, the Company announced in a press release that "its distribution agreement with EMC Corporation has been amended, effective January 1, 2004. The amendment . . . provides for increased costs to Network Engines relating to the sale of EMC-approved host bus adapters (HBAs)." Defendant Bryant quantified the bottom line impact of the amendment as follows:

> The amendment will reduce our gross profit on the sale of EMC-approved HBAs to be more in line with our gross profit on the distribution of other third party storage networking products, which has ranged from 7% to 12% of net revenues," stated Doug Bryant, Vice President of Finance and Administration and Chief Financial Officer of Network Engines.

5.     In reaction to this belated disclosure, the price of Network Engines common stock plummeted, falling $3.92 per share to close at $6.10 per share, a one day drop of

39%, on trading of a dozen times its average daily trading volume for the preceding three months.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

8.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  Network Engines maintains its principal executive offices in this District and many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

9.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff, Wing Kam Yu, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of Network Engines during the Class Period and has been damaged thereby.

11.     Defendant Network Engines is organized under the laws of Delaware and maintains its principal executive offices at 25 Dan Road, Canton, MA 02021.

3

12.     Defendant John Curtis ("Curtis") was Network Engines' Chief Executive Officer, President, and a director, throughout the Class Period.

13.     Defendant Douglas G. Bryant ("Bryant") was Network Engines' Chief Financial Officer and Treasurer throughout the Class Period.

14.     Defendants Curtis and Bryant are referred to collectively herein as the "Individual Defendants."

15.     During the Class Period, each of the Individual Defendants, as senior executive officers and/or directors of Network Engines was privy to confidential and proprietary information concerning Network Engines, its operations, finances, financial condition, present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Network Engines, as discussed in detail below. Because of their positions with Network Engines, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

16.     Each of the defendants is liable as a direct participant in, and a co-conspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and directors were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power

and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their position of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Network Engines' business.

17.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Network Engines had approximately 35.9 million shares of common stock outstanding, which were actively traded on the Nasdaq National Market. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands

of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Network Engines or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violations of federal laws that is complained of herein.

21.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Network Engines; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to

6

individually redress the wrongs done to them.  There will be no difficulty in the management of

this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Materially False And Misleading
### Statements Made During The Class Period

24.    On November 6, 2003, the beginning of the class period, Network Engines

issued a press release reporting its "Second Consecutive Quarter of Profit in Fiscal Fourth

Quarter." In relevant part, the Company reported the following highlights:

> Fourth Quarter Financial Performance Highlights
>
> • Net revenues increased 7 percent sequentially to $28.8 million in the quarter. Sales to a single customer were 42 percent of total net revenues in the fourth quarter, compared to 48 percent in the prior quarter.
>
> • Gross profit was 20.0 percent compared to 20.6 percent in the prior quarter.
>
> • Operating expenses were $4.8 million, compared to $5.3 million in the prior quarter. Fourth quarter operating expenses included a reversal of a first quarter restructuring charge of approximately $377,000 and the reversal of $175,000 of an estimated legal liability recorded in the third quarter.
>
> • GAAP net income, including the reversal of the aforementioned charges, increased to $1.1 million, or $0.03 per share, compared to $408,000 or $0.01 per share in the prior quarter.
>
> • Cash and cash equivalents totaled $36.8 million at the close of the quarter, compared to $38.6 million at the close of the prior quarter.

Commenting on the results, defendant Curtis represented that the Company had achieved a

"dramatic turnaround," reflecting the success of its "business strategy":

> "The results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines," said John Curtis, President and Chief Executive Officer of Network Engines. "Our results reflect the continuing success of our business strategy. We are seeing increasing acceptance of our unique value proposition by our customers and software partners. We recently announced new application partners, including KVS, Inc., Computer Associates International, Inc. and CommVault Systems, Inc., that we will work with to develop and distribute server appliances into our customer base of over 400 channel customers in the growing storage and security networking markets.

In addition, the Company issued the following guidance for the fiscal first quarter, which represented strong growth over the same period last year:

> Business Outlook
>
> Based on current forecasts from certain partners and historical and seasonal trends, the Company anticipates the following for its first fiscal quarter ending December 31, 2003:
>
> • Net revenues in the range of $30 million to $34 million.
> • OEM appliance revenues between $15 million and $18 million.
> • Distribution revenues between $15 million and $16 million.
> • Operating expenses between $5.5 million and $5.8 million.
> • Gross profit in the range of 19 percent to 21 percent.
> • Net income on a GAAP basis in the range of $500,000 to $1.5 million.
> • Cash position between $33 million and $35 million.

Finally, the press release invited readers to participate in a conference call about fiscal 2003 fourth-quarter and fiscal-year results. That was made available live at the company's website at www.networkengines.com and archived on the site."

      25.    The conference call was held at 10 A.M. on November 6, 2003, and was accessible by anyone on the Company's website. A transcript of the call was publicly available from Fair Disclosure Wire. During the conference call, defendant Curtis represented that the Company was poised to capitalize on a growing demand for its products:

> As we have said previously, we believe that there is a trend towards the convergence of storage and security applications and we believe that we have positioned the company to address the growing demand for network appliance solutions in these markets.
>
> We consider our acquisition of TidalWire to be a core success for our company. In our Q4, we benefited from the surge in demand for storage networking products distributed by our TidalWire distribution operation.

      26.    During the question and answer portion of the conference call, when asked specifically whether EMC was "diversifying to another manufacture[r]," defendant Bryant failed to disclose that EMC was demanding terms that would materially and negatively impact Network Engines' profitability in the renegotiation of the distribution agreement:

OMAR ALMADANNI (ph), ANALYST, SOUNDVIEW: Yes, good morning. Just a question on your largest OEM customer here [EMC], from my rough estimate, it looks like it dropped about 7% sequentially in terms of revenues, but you know, that customer had mentioned qualitatively that they saw pretty strong sequential growth in that specific product line.

So I guess the question here is you know, what is the delta coming from, is the, is this customer diversifying to another manufacture, are they pricing more aggressively with you, or you know, how much of that is due to the perhaps consignment issue?

DOUG BRYANT: Omar (ph) , I think, this is Doug. I think we've stated in the past that, you know, it's really difficult to correlate, you know, what we report versus what our partner reports, and you know, all we can tell you that, you know, we ship it when they ask for it. And it's just really tough to do any kind of correlation, you know, the fact that we talked about we changed the way, you know, going from that, going to that consignment inventory situation, you know, that certainly had an impact on it, but other than that, you know, we, you have to talk to our partner about any other questions.

OMAR ALMADANNI (ph): I mean, would you be able to comment on whether that specific partner is diversifying?

DOUG BRYANT: We can't speak for them.

27.      The statements referenced in ¶¶ 24-26 above were each materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, among others:

i)      that EMC was pushing for concessions in contract negotiations that would be materially harmful to the Company;

ii)      that the Company could not meet its financial guidance if the EMC agreement was renegotiated adversely to the Company;

iii)      that the Company's "dramatic turnaround" into profitability was achieved in material part from sales to EMC and would be very difficult to sustain with the changes EMC was, unbeknownst to investors, demanding; and

iv)    that because the foregoing, defendants' representations concerning the Company's expected results was lacking in any reasonable basis when made and were knowingly false.

## The Truth Emerges

28.    On December 10, 2003, the Company announced in a press release that "its distribution agreement with EMC Corporation has been amended, effective January 1, 2004. The amendment . . . provides for increased costs to Network Engines relating to the sale of EMC-approved host bus adapters (HBAs)." Defendant Bryant quantified the bottom line impact of the amendments as follows:

> The amendment will reduce our gross profit on the sale of EMC-approved HBAs to be more in line with our gross profit on the distribution of other third party storage networking products, which has ranged from 7% to 12% of net revenues," stated Doug Bryant, Vice President of Finance and Administration and Chief Financial Officer of Network Engines.

29.    In reaction to this belated disclosure, the price of Network Engines common stock plummeted, falling $3.92 per share to close at $6.10 per share, a one day drop of 39%, on unusually heavy trading volume that was more than a dozen times its average daily trading volume for the preceding three months.

## Undisclosed Adverse Information

30.    The market for Network Engines securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, Network Engines securities traded at artificially inflated prices during the Class Period. The artificial inflation continued until at least December 10, 2003. Plaintiff and other members of the Class purchased or otherwise acquired Network Engines securities relying

upon the integrity of the market price of the Company's securities and market information relating to Network Engines, and have been damaged thereby.

31.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Network Engines common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

32.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Network Engines' earnings. These material misstatements and omissions created in the market an unrealistically positive assessment of Network Engines and its prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the illusion was revealed, and the market was able to accurately value the Company.

### Applicability Of Presumption Of Reliance:<br>Fraud-On-The-Market Doctrine

33.     At all relevant times, the market for Network Engines' securities was an efficient market for the following reasons, among others:

11

(a)    Network Engines' stock met the requirements for listing, and was listed and actively traded on the Nasdaq National Market, a highly efficient and automated market;

(b)    As a regulated issuer, Network Engines filed periodic public reports with the SEC and the Nasdaq National Market;

(c)    Network Engines regularly communicated with public investors <u>via</u> established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Network Engines was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

34.    As a result of the foregoing, the market for Network Engines' securities promptly digested current information regarding Network Engines from all publicly available sources and reflected such information in Network Engines' stock price. Under these circumstances, all purchasers of Network Engines' securities during the Class Period suffered similar injury through their purchase of Network Engines' securities at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

35.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-

looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Network Engines who knew that those statements were false when made.

## FIRST CLAIM

### Violation Of Section 10(b) Of
### The Exchange Act And Rule 10b-5
### Promulgated Thereunder Against All Defendants

36.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

37.     During the Class Period, Network Engines and the Individual Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Network Engines' securities; and (iii) cause plaintiff and other members of the Class to purchase Network Engines' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

38.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to

13

make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Network Engines' securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

39.    Network Engines and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Network Engines as specified herein.

40.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Network Engines' value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Network Engines and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Network Engines' securities during the Class Period.

41.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives

14

and/or directors at the Company during the Class Period; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

42.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Network Engines' operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

43.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Network Engines' securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Network Engines' publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed

15

in public statements by defendants during the Class Period, plaintiff and the other members of the Class acquired Network Engines securities during the Class Period at artificially high prices and were damaged thereby.

44.    At the time of said misrepresentations and omissions, plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of Network Engines, which were not disclosed by defendants, plaintiff and other members of the Class would not have purchased or otherwise acquired their Network Engines securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

45.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

46.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

47.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.    Each of the Individual Defendants acted as a controlling person of Network Engines within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed

16

by the Company with the SEC and disseminated to the investing public, the Individual

Defendants had the power to influence and control and did influence and control, directly or

indirectly, the decision-making of the Company, including the content and dissemination of the

various statements which plaintiff contends are false and misleading. The Individual Defendants

were provided with or had unlimited access to copies of the Company's reports, press releases,

public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or

cause the statements to be corrected.

     49.    In particular, the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and, therefore, are presumed to have

had the power to control or influence the particular transactions giving rise to the securities

violations as alleged herein, and exercised the same.

     50.    As set forth above, Network Engines and the Individual Defendants each

violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

By virtue of their position as a controlling person, the Individual Defendants are liable pursuant

to Section 20(a) of the Exchange Act. As a direct and proximate result of Network Engines' and

the Individual Defendants' wrongful conduct, plaintiff and other members of the Class suffered

damages in connection with their purchases of the Company's securities during the Class Period.

    WHEREFORE, plaintiff prays for relief and judgment, as follows:

     (a)    Determining that this action is a proper class action, designating plaintiff

as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal

Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

    (b)      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

    (c)      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    (d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 3, 2004

**MOULTON & GANS, P.C.**

By: _Nancy Freeman Gans_

    Nancy Freeman Gans, BBO #184540
33 Broad Street, Suite 1100
Boston, MA 02109-4216
(617) 369-7979
Fax: (617) 369-7980

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
Steven G. Schulman
Peter E. Seidman
Andrei V. Rado
One Pennsylvania Plaza - 49th Floor
New York, NY 10119
(212) 594-5300
Fax: (212) 868-1229

**LAW OFFICES OF CHARLES J.
PIVEN, P.A.**
Charles Piven
The World Trade Center-Baltimore
401 East Pratt Street, Suite 2525
Baltimore, MD 21202
(410) 332-0030
Fax: 410-685-1300

*Attorneys for Plaintiff*

18